**IN THE IOWA DISTRICT COURT FOR MARSHALL COUNTY**

| | |
|---|---|
| MARIA ANDRADE, AS ADMINISTRATOR OF THE ESTATE OF JOSE ANDRADE-GARCIA, and HERMINIA ANDRADE,<br><br>PLAINTIFFS,<br><br>V.<br><br>JBS USA, JBS LIVE PORK, LLC, SWIFT PORK COMPANY, TIM SCHELLPEPER, CHRIS GADDIS, BOB KREBS, NICHOLAS WHITE, TODD CARL, BRADLEY COMSTOCK, NICHOLAS AGUIRRE, TYLER DEVICK, NIKKI RICHARDSON, CAMERON BRUETT, and JANE/JOHN DOES 1-20,<br><br>DEFENDANTS. | Case No.: _____<br><br>**PETITION AT LAW AND JURY DEMAND** |

## PETITION FOR DAMAGES

Decedent Jose Andrade-Garcia was the victim of the Defendants' deliberate decisions to value their own corporate profits above his health, safety, and ultimately, his life. For the Plaintiffs' causes of action against Defendants, by and through their undersigned attorneys, they state as follows:

### PARTIES, JURISDICTION, AND VENUE

1.      This case arises from the tragic death of Jose Andrade-Garcia, husband of Plaintiff Herminia Andrade and father of Plaintiff Maria Andrade, who is the administrator of his estate. At all relevant times, Decedent Jose Andrade-Garcia was an employee of Defendant Swift Pork Company.

2.      Decedent Jose Andrade-Garcia was a husband, father, and grandfather. He was exposed to coronavirus due to the wrongful conduct of the Defendants, and, after a prolonged

1

battle, died on May 15, 2020.

3.      Plaintiff Maria Andrade is the duly appointed Administrator of the Estate of Jose Andrade-Garcia, her deceased father. Plaintiff Herminia Andrade is the widow of Jose Andrade-Garcia.

4.      Defendant JBS USA is a foreign, for-profit Delaware corporation with its principal place of business in Greeley, Colorado, and is one of the largest meat suppliers in the world.

5.      Defendant JBS Live Pork, LLC, is a foreign, for-profit Delaware corporation with its principal place of business in Greeley, Colorado. It is registered to conduct business in the State of Iowa and may be served through its corporate agent. Upon information and belief, Defendant JBS Live Pork, LLC is a wholly owned subsidiary of Defendant JBS USA.

6.      Defendant Swift Pork Company is a foreign, for-profit Delaware corporation with its principal place of business in Greeley, Colorado. It is registered to conduct business in the State of Iowa and may be served through its corporate agent. Upon information and belief, Defendant Swift Pork Company is a wholly owned subsidiary of Defendant JBS USA.

7.      Upon information and belief, Defendants JBS USA, JBS Live Pork, LLC, and Swift Pork Company jointly owned, operated, and/or managed the meat processing plant at 402 N. 10th Ave, Marshalltown, Iowa 50158 (hereinafter the "Marshalltown plant"), at which decedent Jose Andrade-Garcia was employed.

8.      Hereinafter, JBS USA, JBS Live Pork, LLC, and Swift Pork Company will be collectively referred to as the "Corporate Defendants".

9.      At all relevant times, Defendant Tim Schellpeper was the Chief Executive Officer of Defendant JBS USA.

2

10.     At all relevant times, Defendant Chris Gaddis was the Head of Human Resources for Defendant JBS USA.

11.     At all relevant times, Defendant Bob Krebs was the President of Defendant JBS USA.

12.     At all relevant times, Defendant Nicholas White was the Head of Health, Safety, and Security for Defendant JBS USA.

13.     At all relevant times, Defendant Carl Todd was the General Manager of the Marshalltown Plant. Upon information and belief, at all relevant times this defendant has been an Iowa resident and continues to reside in Iowa.

14.     At all relevant times, Defendant Bradley Comstock was the Safety Manager of the Marshalltown Plant. Upon information and belief, at all relevant times this defendant has been an Iowa resident and continues to reside in Iowa.

15.     At all relevant times, Defendant Nicholas Aguirre was the Human Resources Representative of the Marshalltown Plant. Upon information and belief, at all relevant times this defendant has been an Iowa resident and continues to reside in Iowa.

16.     At all relevant times, Defendant Tyler Devick was the Assistant Safety Manager of the Marshalltown Plant.

17.     At all relevant times, Defendant Nikki Richardson was the Head of Corporate Communications at Defendant JBS USA.

18.     At all relevant times, Defendant Cameron Bruett was the Head of Corporate affairs for Defendant JBS USA.

19.     Defendants John/Jane Does 1-20 are any unnamed employees, managers, supervisors, or executives employed with Defendant Swift Pork Company or Defendant JBS

Foods USA who are responsible for Plaintiffs' damages. Because Jose Andrade-Garcia is deceased, the identities of these unnamed Defendants are not yet known at this time.

20.     Hereinafter, Defendants Tim Schellpeper, Chris Gaddis, Bob Krebs, Nicholas White, Todd Carl, Bradley Comstock, Nicholas Aguirre, Tyler Devick, Nikki Richardson, Cameron Bruett, and Jane/John Does 1-20 will be collectively referred to as the "Executive Defendants".

21.     Jurisdiction and venue are proper in this Court because the acts and omissions causing Plaintiffs' damages, as well as Plaintiffs' damages themselves, occurred in Marshall County, Iowa.

22.     Plaintiffs certify, pursuant to IA Code § 619.18, that this action meet applicable jurisdictional requirements for the amount in controversy.

23.     Venue is proper under IA Code § 616.18 because the Plaintiffs sustained injuries and damages in Marshall County.

### FACTS COMMON TO ALL COUNTS

### Background

24.     Decedent Jose Andrade-Garcia was employed by Defendants at the Marshalltown plant.

25.     The COVID-19 pandemic began hitting the United States in January 2020, several months prior to time when Mr. Andrade-Garcia was exposed to the virus.

26.     Defendants had several months to prepare the Marshalltown plant for the protection of their employees from the deadly virus.

27.     Despite having knowledge of the spread of the pandemic for several months in advance, Defendants deliberately failed to act in preparation. They disregarded the risk, utterly

failed to protect their workers, and Mr. Andrade-Garcia was killed as a result.

28. The first case of COVID-19, which is the disease caused by the novel coronavirus, was diagnosed in the United States on January 20, 2020.

29. Illinois, a neighboring state to Iowa, reported its first COVID-19 case on January 24, 2020.

30. A national public health emergency was declared on January 31, 2020.

31. On March 5, 2020, the U.S. Congress approved an $8.3 billion emergency spending package to combat the spread of coronavirus, in connection with public health agencies and state and local governments.

32. On March 8, three COVID-19 cases were reported in Iowa.

33. On March 9, as five new COVID-19 cases in Iowa were reported, Iowa Governor Kim Reynolds issued a Proclamation of Disaster Emergency in response to the COVID-19 outbreak.

34. On March 10, Grinnell College announced that all classes would be conducted remotely for the remainder of the semester. The following day, March 11, the University of Iowa, Iowa State University, and the University of Northern Iowa announced that their classes would be held remotely as well.

35. On March 11, the World Health Organization declared the COVID-19 outbreak a global pandemic.

36. On March 13, the president declared a National Emergency in response to the COVID-19 outbreak. The Des Moines Public School District announced the closure of all schools within the district.

37. On March 16, the Iowa legislature passed an emergency appropriations bill to

respond to the pandemic, and then suspended further activity.

38.     On March 17, 2020, the governor declared a State of Public Health Disaster Emergency for the State of Iowa. Restaurants and bars were prohibited from serving dine-in customers, certain non-essential businesses were ordered to close, and public gatherings were limited to no more than 10 people.

39.     On March 24, President Trump approved a major disaster declaration for the State of Iowa in response to the COVID-19 outbreak.

40.     By the end of March 2020, there were nearly 500 confirmed COVID-19 cases in Iowa.

41.     By the end of April 2020, there were more than 7,100 confirmed COVID-19 cases in Iowa.

### Marshalltown Plant Outbreak

42.     By March 2020, there was growing concern among workers at the Marshalltown plant that the Defendants had failed to adequately prepare for the growing threat of the pandemic – and, indeed, that Defendants were recklessly choosing to prioritize corporate operations over their workers' lives.

43.     Daily throughout March and April of 2020, hundreds of workers were absent from their jobs at the Marshalltown plant.

44.     Defendants did not test their Marshalltown plant workers for COVID-19.

45.     Defendants refused to provide any information to the public about how many of their Marshalltown workers reported having COVID-19.

46.     Workers at Defendants' plants were subject to "the point system", a punitive attendance system designed to punish absenteeism. Workers were given points for missing work

and could be terminated based on the number of points they had.

47.     At the Defendants' Marshalltown plant, workers are reportedly fired once they reach seven points,

48.     If an employee tested positive for COVID-19, she could miss work without accruing points.

49.     However, Defendants required their employees to work even while waiting for test results.

50.     Employees could be given points for missing work, even while waiting for test results.

51.     Jose Oliva, founder of a non-profit organization advocating for food industry workers, is adamant that this point system has contributed to the virus's spread. He stated, "It's probably one of the better propagators for the coronavirus that we've seen…It's absolutely disastrous to have a point system in the midst of a pandemic."

52.     Many of Defendants' workers struggled to access testing. Many of Mr. Andrade-Garcia's coworkers at the Marshalltown plant avoided COVID-19 tests due to the cost, wait times, and fear of being targeted by immigration authorities.

53.     Defendants failed to require that workers experiencing COVID-19 symptoms report their symptoms or potential illness to Defendants.

54.     Defendants also failed to require that workers experiencing COVID-19 symptoms stay home from work, self-quarantine, or test for COVID-19.

55.     Defendants even began to _incentivize_ these sick employees to continue showing up to work during the pandemic.

56.     On March 25, 2020, Defendants announced a $600 bonus to those workers who

complied with Defendants' strict attendance policy. The bonus would not be paid until May 15 – nearly two months later.

57.     Thus, Defendants' policies not only _incentivized_ employees to work sick or while waiting for test results, but actually _penalized_ them if they did not.

58.     A worker at Defendants' plant spoke publicly about working while sick. He admitted that in April 2020, despite having a fever, he continued working because he was afraid of being fired. Two weeks later, he tested positive for COVID-19. It was only then that he was able to miss work without being penalized.

59.     Defendants' worker reported that Defendants were "making us go back to work because some damn hogs got to die. But they don't care about human life. They care more about the damn hogs than they do about people."

60.     On or about March 25, 2020, Defendants put on three free New York Strip steak lunches that were purported as "thanks" to their workers for continuing to work during the pandemic. Defendants' Facebook page proclaimed, "All of the amazing JBS employees serving the world during these trying times were served NY Strips and sides. Thanks for a job well done."

61.     However, hundreds of Defendants' workers were crammed inside the Marshalltown plant cafeteria – despite the Iowa governor's order that public gathering be limited to no more than 10 people.

62.     Defendants failed to implement even basic safety precautions during this lunch, such as social distancing and limited quantities of people, and provided no protective equipment such as masks or barriers. Shoulder to shoulder and entirely unprotected from the deadly pandemic, Defendants' workers ate a free meal as "thanks" for their service during the

pandemic. These conditions were memorialized with photos on the Defendants' Facebook page.

63.     Workers endured similar conditions throughout the Marshalltown plant. Defendants deliberately failed to institute proper safety precautions. Their employees were forced to work in cramped conditions and without adequate safety policies and equipment.

64.     While Jose Andrade-Garcia and his coworkers slaughtered and processed animals for Defendants' corporate profits, they themselves were being led to the slaughter by Defendants' recklessness and greed.

65.     In March 2020, several workers at the Marshalltown plant contacted an advocacy group about their fear that the Defendants were choosing to put them all in danger.

66.     Employees reported that Defendants required them to work only inches apart, at full capacity, with no way to distance or protect themselves. Locker rooms and cafeterias were crammed. Workers clogged entrances and exits. Protective equipment was entirely insufficient.

67.     After speaking with the JBS workers and investigating their claims, the Iowa League of United Latin American Citizens determined that the Defendants were failing to protect their workers from the pandemic.

68.     The group called on Defendants to take precautions against exposing their workers to coronavirus, including slowing down the speed of production, adding more space between workers, and requiring coronavirus testing for all employees.

69.     On April 1, 2020, the Iowa League of United Latin American Citizens filed a formal complaint with Iowa OSHA against Defendants for their shocking disregard of their workers' safety.

70.     The advocacy group reported to OSHA that Defendants caused and allowed numerous dangerous conditions: "1. Employees are exposed to COVID-19 due to the high

density of employees that work in close proximity. This includes cutting rooms, processing rooms, break rooms, dressing rooms. Employees are still working shoulder to shoulder. 2. Employees are limited on their personal protective equipment. 3. Employees are required to work with signs and symptoms of COVID-19."

71.     Still, Defendants continued to show reckless disregard for their most critical duty – keeping their workers safe.

72.     On April 20, 2020, the mayor of Marshalltown, Joel Greer, publicly disclosed that at least 34 workers at Defendants' Marshalltown plant had tested positive for COVID-19.

73.     Mayor Greer stated that he thought that discussing the COVID-19 outbreak at the Marshalltown plant was the "right thing to do" and that "I don't know why they aren't letting the media know about the numbers."

74.     Mayor Greer further discussed Defendants' failure to test their workers. "They are relying on the people who have symptoms to get tested. If I were in charge, I would demand testing kits."

75.     In April 2020, Defendant JBS USA ceased operations at certain of its meatpacking plants due to dozens of confirmed COVID-19 cases, including its plants in Worthington, Minnesota and in Greeley, Colorado, where the company is headquartered.

76.     Yet despite dozens of confirmed cases and hundreds of workers absent per day at the Marshalltown plant, Defendants refused to suspend or limit operations at this location and further refused to even test their workers for COVID-19.

77.     When Defendants re-started operations in the plant at its corporate headquarters in Greeley, Colorado, Defendant JBS USA offered COVID-19 testing to all workers with COVID-19 symptoms.

78.     However, Defendants refused to offer such testing for symptomatic workers at the Marshalltown plant.

79.     A spokesman for Defendant JBS USA stated that workers in Marshalltown were not being tested during this timeframe, "though we will consider any and all options to promote the health and safety of our workforce."

80.     However, Defendants recklessly chose to deny their workers proper safety equipment and policies. Their workers lacked sufficient face coverings, respirators, and other personal protective equipment.

81.     Defendants further recklessly chose to not implement or enforce sufficient social distancing measures, have proper testing, erect physical barriers, or take other steps to keep their workers safe.

## Jose Andrade-Garcia's Tragic Death

82.     In April 2020, Jose Andrade-Garcia had worked for Defendants for 21 years. He worked on the production line of the cut floor, hacking meat from pig carcasses.

83.     Mr. Andrade-Garcia began feeling sick during the second week of April 2020. However, he did not have a fever, and Defendants' body temperature scanners purported to not detect any problems. Mr. Andrade-Garcia continued to work for Defendants, afraid of being fired if he did not continue working.

84.     Mr. Andrade-Garcia continued working for Defendants until April 13, when he began having severe difficulty breathing,

85.     His family called 911 on April 17 as Mr. Andrade-Garcia's breathing continued to worsen and he had to gasp for air. He was rushed via ambulance to Unity Point in Marshalltown, and then transferred to University of Iowa hospital for advanced care.

86.     Doctors determined that Mr. Andrade-Garcia contracted COVID-19 due to being exposed to the coronavirus by a coworker at Defendants' Marshalltown plant.

87.     For nearly a month, Mr. Andrade-Garcia suffered painful, terrifying symptoms of coronavirus in solitary confinement, without the presence of his family and loved ones. After battling the virus for over a month, he died on May 15, 2020.

88.     As a direct result of the carelessness, negligence, recklessness, and gross negligence of the Defendants, Mr. Andrade-Garcia contracted COVID-19, suffered horrifically, and tragically died.

89.     Plaintiff Maria Andrade, as Administrator of the Estate of Jose Andrade-Garcia, seeks recovery from Defendants for all damages cognizable under Iowa law, including but not limited to:

        a.     Jose Andrade-Garcia's pre-death physical and mental pain and suffering;

        b.     Jose Andrade-Garcia's pre-death loss of function of the mind and body;

        c.     Jose Andrade-Garcia's pre-death fright and emotional distress;

        d.     Jose Andrade-Garcia's pre-death medical expenses;

        e.     Pecuniary loss of accumulation to the Estate of Jose Andrade-Garcia;

        f.     Interest on premature burial expenses;

        g.     Past and future loss of the love, services, society, companionship, support, affection, and consortium suffered by Herminia Andrade as a result of the death of her husband; and

        h.     Past and future loss of the love, services, society, companionship, support, affection, and consortium suffered by Maria Andrade, Miguel Andrade, Araceli Ambriz, Joes Andrade, Marilu Garcia, and Alejandra

Andrade (who a minor at the time of Mr. Andrade-Garcia's death), as a result of the death of their father.

## COUNT I:  GROSS NEGLIGENCE
### (all Defendants)

90.     Plaintiffs incorporate all prior and subsequent paragraphs as if fully restated and re-alleged herein.

91.     At all relevant times, the Corporate Defendants employed the Executive Defendants in managerial capacities.

92.     At all relevant times, the Executive Defendants were acting within the course and scope of their employment.

93.     The Corporate Defendants are vicariously responsible for the negligence, gross negligence, carelessness, and recklessness of their employees or agents, the Executive Defendants. Pursuant to the doctrine of *respondeat superior*, as the Executive Defendants were acting in the course and scope of their employment and/or agency at the time of the occurrence, their employers shall be liable for their wrongful conduct.

94.     All Defendants owed a duty to Decedent Jose Andrade-Garcia and Plaintiffs to refrain from creating intentional or reckless policies, procedures, or work environments carrying substantial certainty that employee injuries could occur.

95.     The Corporate Defendants, through the actions of their agents, executives, officers, and employees, and the Executive Defendants collectively breached their duties to Decedent Jose Andrade-Garcia and Plaintiffs and were grossly negligent as set forth in Iowa Code § 85.20(2), in the following ways, among others:

> a.     Failing to develop or implement worksite assessments to identify COVID-19 risks and prevention strategies at the Marshalltown plant;

b.   Failing to develop or implement testing and workplace contact tracing of COVID-19 positive workers at the Marshalltown plant;

c.   Failing to develop and implement a comprehensive screening and monitoring strategy aimed at preventing the introduction of COVID-19 into the worksite, including a program to effectively screen workers before entry into the workplace; return to work criteria for workers infected with or exposed to COVID-19; and criteria for exclusion of sick or symptomatic workers;

d.   Allowing or encouraging sick or symptomatic workers to enter or remain in the workplace;

e.   Failing to promptly isolate and send home sick or symptomatic workers;

f.   Failing to configure communal work environments so that workers were spaced at least six feet apart;

g.   Failing to provide workstations, including those along processing lines, aligned so that workers did not face one another;

h.   Failing to install physical barriers, such as strip curtains, plexiglass or similar materials, or other impermeable dividers or partitions, to separate or shield workers from each other;

i.   Failing to develop, implement or enforce appropriate cleaning, sanitation, and disinfection practices to reduce exposure or shield workers from COVID-19 at the Marshalltown plant;

j.   Failing to provide all employees with appropriate personal protective equipment, including face coverings or respirators;

14

k.    Failing to require employees to wear face coverings;

l.    Failing to provide sufficient hand washing or hand sanitizing stations throughout the Marshalltown plant;

m.    Failing to slow production in order to operate with a reduced work force;

n.    Failing to develop, implement or enforce engineering or administrative controls to promote social distancing;

o.    Failing to modify, develop, implement, promote, and educate workers, including those with limited or non-existent English language abilities, on revised sick leave, attendance, or incentive policies to ensure that sick or symptomatic workers stay home;

p.    Failing to ensure that workers, including those with limited or non-existentEnglish language abilities, are aware of and understand modified sick leave, attendance, or incentive policies;

q.    Failing to ensure adequate ventilation in work areas to help minimize workers' potential exposures and failing to minimize air from fans blowing from one worker directly at another worker;

r.    Failing to establish, implement, promote, and enforce a system for workers,including those with limited or non-existent English language abilities, to alert supervisors if they are experiencing signs or symptoms of COVID-19or if they have had recent close contact with a suspected or confirmed COVID-19 case;

s.    Failing to inform workers, including those with limited or non-existent English language abilities, who have had close contact with a suspected

or confirmed COVID-19 case;

t.      Failing to educate and train workers and supervisors, including those with limited or non-existent English language abilities, about how they can reduce the spread of, and prevent exposure to COVID-19;

u.      Failing to encourage or require workers, including those with limited or non-existent English language abilities, to stay home when sick;

v.      Making false and fraudulent misrepresentations on behalf of Defendants, as set forth in the Second Cause of Action below;

w.      Failing to provide and maintain a safe work environment free from recognized hazards that cause or are likely to cause serious physical harm or death;

x.      Failing to take reasonable precautions to protect workers from foreseeable dangers;

y.      Failing to abide by State and Federal rules, regulations, and guidance; and

z.      Implementing policies that incentivized their employees to work sick or while waiting for coronavirus test results and penalized their employees for not working while sick or while waiting for coronavirus test results.

96.     The Defendants' acts and omissions were grossly negligent, reckless, intentional, and constituted willful and wanton disregard for the safety of their workers, including Jose Andrade-Garcia.

97.     The Corporate Defendants are vicariously liable for the culpable acts and omissions committed by all of its agents acting within the course and scope of their agency, including but not limited to the Executive Defendants.

98.     The Defendants engaged in gross negligence amounting to such lack of care as to amount to wanton neglect for the safety of their workers, including Jose Andrade-Garcia.

99.     The Defendants knew of the danger that an uncontrolled COVID-19 outbreak at the Marshalltown plant was likely to result in serious illness or death.

100.    The Defendants knew or should have known that their conduct was likely to cause employees to become seriously ill or die.

101.    The Defendants consciously failed to avoid the danger. They recognized the danger of a COVID-19 outbreak at the facility and yet failed to take sufficient precautions to avoid an outbreak.

102.    The Defendants' acts and omissions directly and proximately caused Plaintiffs' injuries and were a substantial factor in causing those injuries.

103.    The Defendants' prolonged refusal to temporarily close down the Marshalltown plant despite knowing that many workers at the plant had tested positive for COVID-19 and despite knowledge that COVID-19 was rapidly spreading through the workforce at the Marshalltown plant is evidence of their incorrigible, willful and wanton disregard for workplace safety and culpable state of mind.

104.    The Defendants knowingly and intentionally prioritized company profits over the health, safety, and well-being of their employees.

105.    An award of punitive damages is necessary to punish the Defendants for their willful and wanton disregard for workplace safety and to deter them and other similarly situated executives and companies from jeopardizing workers' lives in the future.

WHEREFORE, Plaintiffs pray for judgment against Defendants for all pecuniary, non-pecuniary, and estate damages available under Iowa law, including all actual, incidental, and

consequential damages; punitive damages; attorney's fees and costs incurred in this action; and for such other and further relief as this Court deems just and proper.

## COUNT II: FRAUDULENT MISREPRESENTATION
### (all Defendants)

106.    Plaintiffs incorporate all prior and subsequent paragraphs as if fully restated and re-alleged herein.

107.    Upon information and belief, Defendants made numerous false and fraudulent representations to Jose Andrade-Garcia and other workers at the Marshalltown plant.

108.    Such false and fraudulent representations included but are not limited to those concerning: (1) the presence and spread of COVID-19 at the Marshalltown plant; (2) the sufficiency of safety measures implemented at the Marshalltown plant; and (3) the sufficiency of safety equipment provided at the Marshalltown plant.

109.    Defendants knew these representations were false and fraudulent; they knew or should have known it was wrong to make such false and fraudulent representations; and they intended to deceive and induce Marshalltown employees, including Jose Andrade-Garcia, to continue working despite the danger of COVID-19.

110.    Upon information and belief, the false and fraudulent representations that Defendants made to Jose Andrade-Garcia and other workers at the Marshalltown plant included but are not limited to that:

      a.    COVID-19 had not been detected at the facility;

      b.    COVID-19 was not spreading through the facility;

      c.    Worker absenteeism was unrelated to COVID-19;

      d.    Sick workers were not permitted to enter the facility;

      e.    Sick or symptomatic workers would be sent home immediately and

would not be permitted to return until cleared by health officials;

 f. Workers would be notified if they had been in close contact with an infected co-worker;

 g. Safety measures implemented at the facility would prevent the spread of COVID-19 and protect workers from infection; and

 h. The Marshalltown plant was a safe work environment.

111. These false and fraudulent representations were material.

112. Jose Andrade-Garcia and others accepted and relied on Defendants' representations as true and were justified in doing so.

113. Defendants thereby induced Jose Andrade-Garcia and others to continue working at the Marshalltown plant.

114. Defendants' false representations directly and proximately caused Plaintiffs' injuries and were a substantial factor in causing Plaintiffs' injuries.

115. Defendants' fraudulent misrepresentations and prolonged refusal to temporarily close down the Marshalltown plant despite knowing that many workers at the plant had tested positive for COVID-19 and despite knowing that COVID-19 was rapidly spreading through the Marshalltown workforce are evidence of Defendants' incorrigible, willful and wanton disregard for workplace safety and culpable state of mind.

116. Defendants knowingly and intentionally prioritized profits over the health, safety, and well-being of their Marshalltown employees.

**COUNT III: LOSS OF CONSORTIUM**
**(Herminia Andrade v. all Defendants)**

117. Plaintiffs incorporate all prior and subsequent paragraphs as if fully restated and re-alleged herein.

118.     At all relevant times, Plaintiff Herminia Andrade was the spouse of Jose Andrade-Garcia and was entitled to his services, society, and companionship.

119.     As a direct and proximate result of the gross negligence and resulting death of Jose Andrade-Garcia, Plaintiff Herminia Andrade has suffered and continues to suffer the loss of the financial assistance, earnings, love, affection, services, companionship, comfort, instruction, guidance, counsel, training, and support of her husband; has sustained great pecuniary loss; and will in the future continue to do so.

WHEREFORE, Plaintiff Herminia Andrade prays for judgment against Defendants for all pecuniary, non-pecuniary, and estate damages available under Iowa law, including all actual, incidental, and consequential damages; punitive damages; attorney's fees and costs incurred in this action; and for such other and further relief as this Court deems just and proper.

### COUNT IV: PUNITIVE DAMAGES
### (all Defendants)

120.     Plaintiffs incorporate all prior and subsequent paragraphs as if fully restated and re-alleged herein.

121.     The conduct of each of the Defendant tortfeasors, individually and in concert with each other, proximately caused Plaintiffs' damages including the injuries and death of Decedent Jose Andrade-Garcia.

122.     The conduct of each of the Defendant tortfeasors amounts to conscious indifference to the consequences sufficient to warrant and demand and justify an award of punitive damages, in such an amount that the jury deems just and appropriate to penalize, punish, and deter the Defendant tortfeasors in the future.

123.     Defendants knew, were substantially aware, should have known, or acted in reckless disregard to the fact that Plaintiffs and all others similarly situated would be harmed if

their workers, including Decedent Jose Andrade-Garcia, were denied lifesaving safety procedures, equipment, and testing despite the grave risks of the coronavirus pandemic.

124.    Defendants knew or had reason to know that a high degree of probability existed that their actions would result in injury.

125.    Defendants were conscious of their conduct and had knowledge that their conduct would naturally and probably result in injury, even if they lacked a specific intent to cause the injury.

126.    Knowing these risks, Defendants also induced Decedent Jose Andrade-Garcia to continue working through false claims that his workplace was safe, while denying him lifesaving safety procedures, equipment, and testing, causing his death.

127.    These willful, wanton, and malicious acts of Defendants evidence their complete indifference and conscious disregard for the health and safety of Decedent Jose Andrade-Garcia and Plaintiffs, and others similarly situated, which justifies the submission of punitive damages and/or aggravating circumstances in this case.

128.    An award of punitive damages is necessary to punish Defendants for their willful and wanton disregard for workplace safety and to deter them and other similarly situated companies from jeopardizing workers' lives in the future.

WHEREFORE, Plaintiffs pray for judgment against Defendants for all pecuniary, non-pecuniary, and estate damages available under Iowa law, including all actual, incidental, and consequential damages; punitive damages; attorney's fees and costs incurred in this action; and for such other and further relief as this Court deems just and proper.

DATED THIS: 4th day of April, 2022.

Respectfully Submitted,


By: */s/ Nicholas C. Rowley*

**TRIAL LAWYERS FOR JUSTICE, P.C.**

Nicholas C. Rowley    AT0009516
Dominic F. Pechota    AT0006175
Jon Specht            AT0012576
421 W. Water St., Third Floor
Decorah, IA 52101
Phone: (563) 382-5071
Fax: (888) 801-3616
Email: nick@tl4j.com; dominic@tl4j.com;
jon@tl4j.com

*and*

**WELDER BLUNT WELDER, LLC**

Brent W. Welder (*pro hac vice* to be submitted)
Kristie L. Welder (*pro hac vice* to be submitted)
4741 Central Street, #514
Kansas City, Missouri 64112
Phone: 844-935-3373
Fax: 844-935-3373
Email: bwelder@welderfirm.com;
kwelder@welderfirm.com

**COUNSEL FOR PLAINTIFFS**

## DEMAND FOR JURY TRIAL

COME NOW, Plaintiffs, and hereby demand a jury trial on all issues so triable under Iowa law.

DATED THIS: 4th day of April, 2022.

Respectfully Submitted,

By: */s/ Nicholas C. Rowley*

**TRIAL LAWYERS FOR JUSTICE, P.C.**

Nicholas C. Rowley   AT0009516
Dominic F. Pechota   AT0006175
Jon Specht         AT0012576
421 W. Water St., Third Floor
Decorah, IA 52101
Phone: (563) 382-5071
Fax: (888) 801-3616
Email: nick@tl4j.com; dominic@tl4j.com;
jon@tl4j.com

*and*

**WELDER BLUNT WELDER, LLC**

Brent W. Welder (*pro hac vice* to be submitted)
Kristie L. Welder (*pro hac vice* to be submitted)
4741 Central Street, #514
Kansas City, Missouri 64112
Phone: 844-935-3373
Fax: 844-935-3373
Email: bwelder@welderfirm.com;
kwelder@welderfirm.com

**COUNSEL FOR PLAINTIFFS**